In the Matter of the Application of the UNITED TRACTION COMPANY, Petitioner, for a Certiorari Order against the PUBLIC SERVICE COMMISSION OF THE STATE OF NEW YORK and Others, Respondents.

Third Department, January 5, 1927.

Street railways — power of Public Service Commission to regulate rates in cities of Troy and Rensselaer — Laws of 1921, chap. 134, amending Public Service Commission Law, § 49, subd. 1, permitted Commission to increase rates previously established by contract or other agreement — while that law was in effect Commission fixed rates on petitioner's lines in said cities above franchise rate — Laws of 1923, chap. 891, striking said power from statute did not operate to repeal rate fixed by Commission and restore prior franchise rate — rates established by Commission were legal rates, franchise rates having been abolished — Commission now has power to change said rates either up or down — furthermore, early franchise rates granted to different railroads subsequently combined into petitioner were in Troy superseded by franchise granted petitioner in which rates were specifically brought under Railroad Law, art. 4 (Art. 5 after 1910) — hence Troy rates were not under agreement or franchise and Commission had power to change them — franchise rates in Rensselaer were superseded by Laws of 1905, chap. 358, and Commission has power to regulate rates on those lines.

In this proceeding instituted to have the Public Service Commission establish new rates on the petitioner's lines, the Public Service Commission held that it did not have any power to increase the rates on the lines of the petitioner in the cities of Troy and Rensselaer. The Public Service Commission is in error, since it appears that by chapter 134 of the Laws of 1921, amending the Public Service Commission Law, section 49, subdivision 1, the Public Service Commission was given the power to increase rates previously established by contract, grant, franchise, condition, consent or other agreement; that thereafter it did increase the rates on the lines in question under the power given it by said statute; that while the power so granted to the Public Service Commission was subsequently withdrawn by chapter 891 of the Laws of 1923, that statute did not purport to repeal the rates previously fixed by the Public Service Com-

mission and to restore the prior franchise rate. Accordingly, the rates established by the Commission under the statute of 1921 were legal rates and the act of the Commission in so regulating the rates had the effect of abolishing the franchise rates under which the petitioner previously operated, and, therefore, the Commission now has the power to change said rates either up or down on the lines in question.

Furthermore, early franchise rates under which several different railroads in the city of Troy operated, which railroads were subsequently combined into the petitioner, were superseded by a franchise granted to the petitioner by the city of Troy, in which it was specifically stated that the consent was granted upon the express condition that the provisions of article 4 (Art. 5 after 1910) of the Railroad Law pertinent to the question of rates should be complied with. Therefore, the effect of that franchise was to do away with all the earlier agreed or franchise rates, and to bring the question of rates under the Railroad Law, and, therefore, under the jurisdiction of the Public Service Commission.

The early franchise rates on lines in the city of Rensselaer were abrogated by chapter 358 of the Laws of 1905, an act relating to the regulation of fares of electric railroads in and between the cities of Albany and Rensselaer, which act expressly eliminated the six-cent fare theretofore charged under the franchises, and required the railroad to carry passengers at a single fare of five cents between any two points on its lines within the limits of the two cities, and issue transfers entitling the holder to ride to any other point upon the petitioner's road or branches therein without additional fare. This statute expressly abrogated the prior franchise between the petitioner and the city of Rensselaer and hence the Public Service Commission has power to determine and fix the rates in that city.

CERTIORARI ORDER granted out of the Supreme Court on the 9th day of October, 1926, directed to the Public Service Commission of the State of New York and the members thereof, commanding them to certify and return to the office of the clerk of the county of Albany all and singular their proceedings had in reference to rates on certain portions of the lines of the petitioner.

Certiorari to review a determination of the Public Service Commission of the State of New York rendered June 23, 1926, and reaffirmed on a rehearing thereof by order dated August 18, 1926. This determination was to the effect " that the Legislature has revoked the power to regulate rates fixed in franchise agreements by the repeal of the statute conferring it, and that the Public Service Commission has no jurisdiction now to exercise such delegated authority, and that therefore evidence should not be received in this proceeding as to valuation, operating expenses and revenues of the lines of the United Traction Company within the City of Troy and the City of Rensselaer affected by such franchise agreements, except in so far as such evidence may be necessary to permit an allocation of the revenues and expenses of the system to those lines unaffected by franchises and over which the Commission has jurisdiction to fix rates, and that the Commission as a fact-finding body must regard such agreements as valid and subsisting

until they have been annulled or limited by a court of competent jurisdiction."

In general, the contention of counsel for the petitioner, United Traction Company, is that all franchise rates (made by local consent agreements of the petitioner and its predecessors with the cities of Troy and Rensselaer, respectively) had been previously converted into statutory rates and that the Public Service Commission erred in its determination. An order of certiorari was procured for the purpose of obtaining a review of that determination by this court.

The United Traction Company is a domestic street surface railroad corporation. Its principal place of business is in the city of Albany, N. Y. Its activities are in Albany and Rensselaer counties. It operates, as a single street surface railway system, lines in and between the cities of Albany, Troy, Watervliet, Rensselaer and Cohoes, the villages of Waterford and Green Island and the towns of Waterford and Colonie. It was organized under that name by the merger of several street railroad companies on December 31, 1899. One of those companies was the Troy City Railway Company.

Our attention is particularly drawn to the history of that company. Its name had previously been Troy and Albia Horse Railroad Company and was changed by order of the Supreme Court, granted June 20, 1891. Also, the Troy and Lansingburgh Railroad Company became merged in the Troy City Railway Company on January 25, 1894. One of the contentions of the petitioner is that while restrictions as to rates of fare are found in some of the earlier franchises of these companies, all of such restrictions have been superseded by provisions in later franchise agreements with the city of Troy which were intended to and did place all operations in that city under what is now section 181 of the Railroad Law and, therefore, subject to the jurisdiction of the Public Service Commission.

An analysis of the franchises granted to these companies by the city of Troy and the village of Lansingburgh up to the time that the United Traction Company came into existence, seems to show:

*First.* That the franchises granted to the Troy and Albia Horse Railroad Company prior to July 17, 1890, were superseded by the ordinance of the city of Troy of that date, and the rate of fare fixed at not to exceed ten cents on that portion of the rails of said company which had been laid prior to said date. The ordinance of July 17, 1890, amended an ordinance relating to that company (passed May 3, 1866) and authorized the substitution of electric

7

power in the place of horse power.   The fare provision in the 1866 ordinance was amended by the 1890 ordinance so as to read as follows: " The fares to be collected on the said road shall not be increased beyond those now limited and allowed by law without the consent of the Common Council by resolution duly passed for that purpose, *and whenever the said railroad company shall change its motive power from horse power to either cable or electric power, the fare to be collected on the said road for any point or distance between the terminal of said railroad shall not exceed (10) cents.*"   The portion in italics was the new provision as to fares.   Soon after the passage of this ordinance of July 17, 1890, the motive power was changed to electric power and the right to the ten-cent fare was thereby ripened.

*Second.* That on August 5, 1890, the Troy and Albia Horse Railroad Company was granted an additional franchise to extend its road in the city of Troy, and in the ordinance a fare restriction confined to the extension alone was fixed at not to exceed five cents.   The ordinance provided: " The rate of fare to be collected *on that portion of its said railroad which the said company is authorized to extend and operate as herein provided* shall not exceed the sum of five cents."

*Third.* That, after the name of the company was changed to Troy City Railway Company on June 20, 1891, several other ordinances were passed by the city of Troy, each authorizing an extension of that company's lines and each prescribing in effect a five-cent fare restriction but limited in each case only to the proposed extension.   There was no express provision in any of these ordinances as to fares but each contained substantially a provision that " the *extension* of said railroad and the operation thereof is hereby made subject to all the conditions and provisions mentioned in the said ordinance of August 5, 1890, Troy and Albia Horse Railroad ordinance, as fully as if the same were incorporated herein." The intent, therefore, was to confine the five-cent fare restriction in the case of each extension to " that portion of its said railroad which the said company is authorized to extend and operate as herein provided," which was the language of the ordinance of August 5, 1890.

*Fourth.* That franchises granted by the city of Troy to the Troy and Lansingburgh Railroad Company prior to August 5, 1890, were partly superseded by an ordinance of the city of Troy of that date, which contained the following provision: " The rate of fare to be collected for a ride in any one general direction upon the railroad of said company, *within the City of Troy*, shall not exceed the sum of five cents."   Lansingburgh, which later became

a part of the city of Troy, was at that time and had been a village located at the other terminus of the Troy and Lansingburgh railroad. Ordinances of the city of Troy of August 20, 1860, and January 29, 1867, contained the following fare provision: " The fare to be collected on this road shall not exceed five cents, except that from Lansingburgh to the southern terminus or return the fare to be collected may be seven cents." Also, an ordinance of August 20, 1891, which permitted new construction in the city of Troy, provided that the permission was granted subject to the rights and restrictions expressed in the ordinance of January 29, 1867. This presumably included by reference the restriction to a seven-cent fare between Lansingburgh and the southern terminus of the road in Troy. Otherwise the fare in the city of Troy on this particular road, in 1891, by franchise agreement, remained at not to exceed five cents, as agreed to in the said ordinance of August 5, 1890.

*Fifth.* That the trustees of the village of Lansingburgh passed an ordinance on August 8, 1861, for the benefit of the Troy and Lansingburgh Railroad Company which contained the following fare restriction: " The fare to be collected on said road shall not exceed five cents, except that from Lansingburgh to the southern terminus or return, the fare to be collected may be seven cents." By ordinance of April 22, 1889, the trustees of that village permitted the company to change its motive power from horse to electricity. The ordinance contained no provision expressly referring to the rate of fare but contained a clause that the grant was " subject to such obligation and agreements as said Company may now be under to the village of Lansingburgh." By chapter 665 of the Laws of 1900 the village of Lansingburgh became annexed to the city of Troy effective January 1, 1901. Prior to that annexation and, as we understand it, on January 25, 1894, the Troy City Railway became the owner of the whole of the capital stock of the Troy and Lansingburgh Railroad Company, pursuant to the then section 79 of the Railroad Law, and became the lessee of the property of the latter company. Thus at the time of the annexation of the village of Lansingburgh to the city of Troy in 1901 the rate of fare within the village of Lansingburgh was five cents under the ordinance of that village passed August 8, 1861, and the rate of fare from Lansingburgh to the southern terminus of that particular line in Troy or return was not to exceed seven cents.

On December 31, 1899, the Troy City Railway Company, the Albany Railway Company and the Watervliet Turnpike and Railroad Company consolidated under the Railroad Law under the

name of the United Traction Company. The Rensselaer lines were a part of the Albany Railway Company system and will be referred to later. After the formation of the United Traction Company, franchises were granted to it by the city of Troy on April 13, 1906, May 17, 1906, June 27, 1912, and February 6, 1913, in each of which an extension of the lines of that company in the city of Troy was granted. The restriction contained in each of these franchises, and the only one, was the following provision: "This consent is granted upon the express condition that the provisions of Article IV of the Railroad Law of the State of New York pertinent thereto shall be complied with."

It may be profitable to state at this point the contention of the petitioner as to the status of the franchise agreements with the city of Troy as they existed on the 31st day of December, 1899, when the United Traction Company came into existence and became the sole owner of all the street railways operating in that city, and prior to the granting of the franchises to the United Traction Company upon the express condition that the provisions of the Railroad Law should be complied with. The contention is that on December 31, 1899, there were in effect a number of separate and distinct fare restrictions in separate zones of the city by virtue of the various franchise agreements. On a part of the lines within the city of Troy a ten-cent fare restriction existed. On various segregated extensions of those lines within the city five cents could be charged upon each separate extension. Five cents could be charged within the area of the old village of Lansingburgh and seven cents from Lansingburgh to the old southern terminus in Troy. It is argued that as long as the franchise agreements specifying such separate and distinct rates were in effect the United Traction Company was entitled to demand and collect the full fare so provided and could not be required to carry passengers beyond the rails directly affected by any of them without receiving another fare.

That was apparently the situation before the United Traction Company itself, in 1906, 1912 and 1913, obtained the further franchises for extensions to its lines in the city of Troy under the single condition that it should comply with article IV of the Railroad Law, which article provided for a rate of fare at not to exceed five cents. Nothing was stated in that condition which expressly related it to the extension alone. It is the contention of the petitioner that it was not the purpose of the parties to these later franchise agreements that each of the extensions provided for was to be operated as a separate entity with the right to charge a separate rate of fare for service thereon. That would have complicated

still more the result already obtaining by virtue of the various franchises previously granted, under which there existed a complex and inconsistent system of diverse rates on the older portions of the railway lines. It is argued that the purpose of these later franchises was that the entire railway system owned and operated by the grantee in the city of Troy should be operated as a unit with a single rate of fare, namely, the rate fixed by the Railroad Law. Two of these later franchise conditions were imposed in 1912 and 1913, after the Public Service Commissions Law went into effect.

In 1918 the city of Troy passed an ordinance suspending the former franchises in reference to rates of fare and consenting to an increase from five cents to six cents and limiting the time of such increase to six cents until the signing of a general treaty of peace in connection with the World War. In 1919 it passed a similar ordinance consenting to a further increase to seven cents for one year. In 1920 an additional increase was rejected by the city. A proceeding was brought before the Public Service Commission which was decided by the Commission on January 21, 1921. (*Matter of United Traction Co.*, 1 Pub. Serv. Com. Rep. [1921] 153; 25 State Dept. Rep. 226.) The Commission held that the earlier franchise agreements remained in force and effect and that the Commission lacked power to change rates affected by such agreements. About the time of this decision the Legislature amended the law so as to expressly confer that power on the Commission (Laws of 1921, chap. 134, § 29) and no appeal was taken from the decision of the Commission by the petitioner. A new proceeding was instituted instead which will be considered after briefly referring to the history of the franchise agreements in the city of Rensselaer.

The ordinances granted by the city of Rensselaer to the petitioner and its predecessor, the Albany City Railway Company, were passed April 27, 1897, and July 31, 1903. The fare provision in each of these ordinances limited the fare to be charged in the city of Rensselaer to five cents and between any point in Rensselaer and Broadway and State street in the city of Albany to six cents. It is the contention of the petitioner that these fare limitations were superseded by chapter 358 of the Laws of 1905, entitled. " An act for the regulation of fares of electric railroads in and between the cities of Rensselaer and Albany, New York, and to provide for the issue of transfer tickets thereon." This act was in clear conflict with the fare provisions of the franchise agreements to the detriment of the petitioner. The six-cent fare was eliminated and the petitioner was required to carry passengers for a single fare of five cents between any two points on its lines within

the limits of the two cities and to issue transfers entitling the holder to ride to any other point upon the petitioner's road or branches therein without additional fare. That law was challenged before the Public Service Commission and the determination of the Commission that the statute of 1905 superseded and controlled the rate of fare was affirmed in *People ex rel. Cohoes Railway Co.* v. *Pub. Serv. Comm.* (143 App. Div. 769; aff'd., 202 N. Y. 547). In 1918 the effect of that statute of 1905 was again discussed by the Public Service Commission (*Matter of United Traction Co.*, 7 Pub. Serv. Com. Rep. 2d Dist. 207; 17 State Dept. Rep. 371), and the Commission held that the rate was a statutory rate and subject to the jurisdiction of the Commission. In the 1921 proceeding, however, the Commission took an adverse view upon this subject, in its decision of January 21, 1921 (*Matter of United Traction Co.*, 1 Pub. Serv. Com. Rep. [1921] 153; 25 State Dept. Rep. 226), claiming lack of power due to the franchise agreements. Soon thereafter the Legislature amended the law so as to expressly confer that power on the Commission (Laws of 1921, chap. 134, § 29, *supra*), and no appeal was taken from the decision of the Commission by the petitioner.

A new proceeding before the Public Service Commission was instituted in 1921 by the petitioner to take advantage of the 1921 amendment to the statute. The petition was for an increase of rates covering the entire system of the petitioner, notwithstanding any franchise agreements in the cities of Troy and Rensselaer. On June 29, 1922, the Commission made an order fixing, amongst other rates, the maximum rate of fare in said cities at seven cents. The order provided that such new rates should be effective from July 5, 1922, to January 1, 1923, " and thereafter until otherwise ordered by this Commission." On July 5, 1922, the petitioner put into effect the rates of fare therein authorized and ever since it has been and is now charging and receiving such fares. The order of June 29, 1922, has not been changed by the Commission.

By chapter 891 of the Laws of 1923 the Legislature revoked the power conferred upon the Commission to regulate rates prescribed by franchise agreements which had been expressly conferred by chapter 134 of the Laws of 1921. The repealing act of 1923 went no further than to revoke the power previously granted by excising from the statute the language introduced therein in 1921. It did not express a retroactive purpose and no further change has since been made to the statute.

On or about February 11, 1926, the petitioner filed its present petition with the Commission praying that a proceeding, begun in 1925 but closed by consent, be reopened and further praying

that a ten-cent basic fare be granted with provision for the sale of thirteen tokens for one dollar. The proceeding was thereupon reopened. At the hearing the cities of Troy and Rensselaer appeared and questioned the jurisdiction of the Commission to hear the application for an increased rate of fare in the said cities. The ground of objection was that the authority of the Commission to regulate the rates of petitioner in said cities which had been fixed by franchise agreements had been revoked and that the intent of the Legislature in revoking that authority was to restore conditions with regard to franchise rates to the status which existed prior to the 1921 amendment even in a case where the Commission had exercised the temporary power conferred upon it in 1921. The Commission has adopted that view and on June 23, 1926, it determined that it then had no power to regulate rates fixed in franchise agreements and that such agreements must be regarded by the Commission as " valid and subsisting until they have been annulled or limited by a court of competent jurisdiction." A rehearing was sought and granted and thereafter on August 18, 1926, the Commission made an order reaffirming in all respects its determination of June 23, 1926. The order of certiorari in this case was granted to review such determination.

*John E. MacLean* [*Lewis E. Carr* and *H. T. Newcomb* of counsel], for the petitioner.

*Charles G. Blakeslee,* for the respondent Public Service Commission.

*Edward J. Donohue,* for the respondent City of Troy.

*Gilbert V. Schenck* [*Michael D. Reilly* of counsel], for the respondent City of Albany.

No appearance for city of Rensselaer.

PER CURIAM. Prior to 1921, subdivision 1 of section 49 of the Public Service Commission Law (as amd. by Laws of 1911, chap. 546), which conferred jurisdiction upon the Commission to fix, by decrease or increase, " the just and reasonable rates, fares and charges to be thereafter observed " by common carriers, including street railroad corporations, read as follows: " 1. * * * the Commission shall * * * determine the just and reasonable rates, fares and charges to be thereafter observed and in force as the maximum to be charged for the service to be performed, *notwithstanding that a higher rate, fare or charge has been heretofore authorized by statute, and shall fix the same by order to be served upon all common carriers, railroad corporations or street railroad*

*corporations by whom such rates, fares and charges are thereafter to be observed."*

By chapter 134 of the Laws of 1921 the material part of subdivision 1 of section 49, above quoted, which was changed, was made to read as follows: "*notwithstanding that a higher or lower rate, fare or charge has been heretofore prescribed by general or special statute, contract, grant, franchise condition, consent or other agreement,* and shall fix the same by order to be served upon all common carriers, railroad corporations or street railroad corporations by whom such rates, fares and charges are thereafter to be observed. *Any such change in rate, fare or charge shall be upon such terms, conditions or safeguards as the Commission may prescribe.*" The foregoing was embodied without change in the amendments to said subdivision made by chapter 335 of the Laws of 1921.

By chapter 891 of the Laws of 1923, subdivision 1 of said section 49, in the particulars above quoted, was so amended as to read as follows: "*notwithstanding that a higher rate, fare or charge has been heretofore authorized by general or special statute,* and shall fix the same by order to be served upon all common carriers, railroad corporations or street railroad corporations by whom such rates, fares and charges are thereafter to be observed." Such is the law to-day.

The statute of 1923 did nothing more than to excise the amendment of 1921 by striking out the language inserted in 1921. The Legislature was silent as to rates which had been "changed" and "fixed" by the Commission during the period when the Legislature had expressly authorized the Commission to "change" and "fix" rates notwithstanding franchise agreements. It is urged that the Legislature in 1923 intended to repeal such orders of the Commission as had been made, under the 1921 statute, allowing increases over franchise rates and to leave the situation exactly as it had been prior to the act of 1921. In other words, the contention is that the order of the Commission made June 29, 1922, fixing the rate of fare of the petitioner in the cities of Troy and Rensselaer above the franchise rate in those cities, has been repealed by the Legislature and that the legal rate of the petitioner is now the franchise rate. This seems to us to violate the long-established rule that a construction of a statute which will give it a retroactive operation is not favored and that it will not be given such a construction unless its language, either expressly or by necessary implication, requires that it be so construed. If the Legislature of 1923 had intended to undo the changes made by the Commission during the period of its undoubted jurisdiction and to refix those rates at the original franchise rates, suitable language of annulment

could have been used. No such language was used and an attempt to inject it into the law in the 1924 session of the Legislature was unsuccessful. The bill failed of enactment into law. Our conclusion is that the legal rates of the petitioner became those fixed by the Commission by its order of June 28, 1922. (*Matter of Village of Brownville* v. *Pub. Serv. Comm.*, 209 App. Div. 640; affd., *sub nom. People ex rel. Village of Brownville* v. *Pub. Serv. Comm.*, 240 N. Y. 586.) Any franchise rates in Troy and Rensselaer became no longer binding. There cannot be two inconsistent legal rates. The rates fixed by the Commission are the legal rates, under the terms of the Commission's order, "until otherwise ordered by this Commission." Its order was in effect the act of the Legislature, with which the Legislature has not seen fit to interfere expressly or by necessary implication. Whether the Legislature of 1923 by necessary implication withheld from the Commission the power to increase or decrease the legal rates fixed by its orders pursuant to the statute as amended in 1921, is a further question to answer. If the Commission has the power to decrease them it has the power to increase them. No more authority exists for the one than the other. Its power to regulate at all is a purely delegated power. Its express power to regulate rates, "notwithstanding that a * * * lower rate, fare or charge has been heretofore prescribed by * * * franchise condition, consent or other agreement," as the 1921 amendment read, has been withdrawn. The reasonable if not the necessary implication was that in the above provision the Legislature referred to franchise conditions, consents or agreements which at the time of contemplated action by the Commission would be binding agreements. The mere fact that they had previously existed would be of no importance, if they had been waived or had been superseded by later agreement or statute. In such cases the Commission already had jurisdiction and has it to-day. When the Legislature repealed the above provision in 1923, any Troy and Rensselaer franchise conditions were not binding agreements. They had been superseded by the legal order of the Commission pursuant to statute. We think it is not going too far to say that since the Legislature in its repeal did not interfere with such statutory rates, it did not revive the former franchise rates which had been superseded by them, but intended that only binding franchise agreements should preclude the Commission from exercising jurisdiction. *Matter of Village of Mamaroneck* v. *Public Service Commission* (208 App. Div. 330; affd., 238 N. Y. 588) is not to the contrary. n that case the franchise agreement had not been changed by the Commission during the period when power to do

so had been delegated to it. Its delegation of power had been withdrawn before any new rate could be fixed.

Assuming, however, that we have not properly interpreted the legislative intent in our analysis thus far, we think that the determination of the Commission in this case must be annulled for the reason that Troy and Rensselaer franchise agreements containing fare provisions were superseded prior to the order of the Commission of June 29, 1922. They are not binding agreements which interfere with the present jurisdiction of the Commission, irrespective of that order. Chapter 358 of the Laws of 1905, the effect of which has been fully set forth in the statement of facts herein, clearly superseded the Rensselaer franchise agreements and it has been so held. (*People ex rel. Cohoes Railway Co.* v. *Pub. Serv. Comm.*, 143 App. Div. 769; affd., 202 N. Y. 547.) Several times since the United Traction Company came into existence on December 31, 1899, and twice since the Public Service Commissions Law was passed in 1907, the city of Troy has passed ordinances consenting to the extension of the United Traction Company lines in that city. The restriction contained in each of these franchises, and the only one, was the following provision: " This consent is granted upon the express condition that the provisions of Article IV of the Railroad Law of the State of New York pertinent thereto shall be complied with." Much that might be stated here, as to diverse franchise rates which existed in the city of Troy prior to the time when the United Traction Company obtained the franchises containing the above provision, appears in the statement preliminary to this opinion and need not be repeated. When the city of Troy granted the later franchises upon the sole and express condition that the provisions of article IV of the Railroad Law should be complied with, we think it was clearly its purpose to apply that condition to every part of the United Traction Company's system operating in that city. It was advantageous for it to do so. One of the earlier franchises authorized a ten-cent fare on one of the company's lines. Another authorized a seven-cent fare. A number of separate zones each carrying a separate five-cent fare might possibly have been established in the city under separate franchises. All such possibility of confusion, annoyance and expense could be fairly eliminated in the interest of the city and the company by agreeing to a general five-cent rate throughout the city under the provisions of article IV of the Railroad Law, which is now article 5 of the Railroad Law. We think the parties intended to accomplish that result. In that article of the Railroad Law the Legislature expressly reserved the right to regulate rates of fare. The city of Troy thus consented to

such regulation even in 1912 and 1913, when two of these consents were granted, which was after the Legislature had delegated its power to fix rates to the Public Service Commission. It follows that none of the local fare restrictions in the earlier franchises remained in force and that the only restriction was that of the general rule of the State, which restriction is subject to the general authority of the Commission. (*Pub. Serv. Comm.* v. *Westchester St. R. R. Co.,* 206 N. Y. 209; *Matter of International Railway Co.* v. *Pub. Serv. Comm.,* 226 id. 474; *People ex rel. City of New York* v. *Nixon,* 229 id. 356; *People ex rel. Garrison* v. *Nixon,* Id. 575; *Matter of Evens* v. *Pub. Serv. Comm.,* 214 App. Div. 122.)

For these reasons the determination of the Public Service Commission should be annulled and the matter remitted to the Commission.

COCHRANE, P. J., VAN KIRK, HINMAN, McCANN and DAVIS, JJ., concur.

Determination annulled and matter remitted, with fifty dollars costs and disbursements.